# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| JOHN ARDEN AHNEFELDT, ROBERT BROWER, JR., ROBERT BROWER, SR., KHANH L. BUI, JIGNESH CHANDARANA, KRUITIKA CHANDARANA, AMIRA YOUSUF CHOWDHURY, CHRISTOPHER COLIGADO, DANIEL GAD, EDWIN HOWELL, SIOE LIE HOWELL, DARREN HUNTING, ANNE INGLEDEW, SHITAL MEHTA, THOMAS CARL RABIN, ADAM SHULTZ, AMIT SOMANI, JAYAPRAKASH SRINIVASAN, AARTHI SRINIVASAN, CHRISTOPHER SWEDLOW and ALEXANDRE TAZI, on Behalf of Themselves and All Others Similarly Situated, | CASE NO. _____ <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> JURY TRIAL DEMANDED |
|       Plaintiffs, |  |
| v. |  |
| DAVID DICKSON, STUART A. SPENCE, and CHRISTOPHER A. KRUMMEL |  |
|       Defendants. |  |

Plaintiffs John Arden Ahnefeldt, Robert Brower, Jr., Robert Brower, Sr., Khanh L. Bui, Jignesh Chandarana, Krutika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, and Alexandre Tazi ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through their counsel, which included a review of defendants' public documents, announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding McDermott International, Inc. ("McDermott" or the "Company"), the filings in *In re McDermott International, Inc*., No. 20-30336 (DRJ) (S.D. Tex. Bankr., Houston Div.) (the "Bankruptcy Proceeding") which include declarations, statements and testimony submitted under the penalty of perjury by McDermott and its directors, officers, agents and advisors, and other publicly available information.  Plaintiffs believe that substantial evidentiary support will exist for the allegations herein after a reasonable opportunity for further investigation or discovery.

## I.      NATURE OF THE ACTION

1.      This federal securities class action is on behalf of all persons or entities that, between September 20, 2019 and January 23, 2020, both days inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock of McDermott (NYSE: MDR), or call options of or guaranteed by McDermott, and seeks to recover damages caused by Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This action seeks relief in connection with a scheme to deceive the investing marketplace about McDermott's true financial condition, artificially inflate the market price of McDermott common stock and other publicly traded securities, and cause Plaintiffs and members of the putative Class (defined below) to purchase McDermott common stock and other publicly traded securities at artificially inflated prices.

3.     In furtherance of the scheme, Defendants knowingly and/or recklessly made, and caused McDermott to make materially false and misleading statements, and/or omit material facts regarding the sale of certain assets of McDermott.  These statements were made with the intent to conceal the acute liquidity crisis McDermott actually faced, provide the Company time to prepare a prepackaged plan of reorganization with its secured lenders and other stakeholders, and avoid a freefall Chapter 11 filing.

4.     Defendants' false statements regarding McDermott's financial condition and long-term prospects did mislead Plaintiffs and the investing public.  Defendants' further efforts to counter media reports of a McDermott bankruptcy filing as merely rumor or speculation were equally deceptive.

5.     After assuring investors that the Company's financial and operating condition was improving and that it had a long-term balance sheet solution to right the ship, on January 21, 2020, Defendants authorized the filing of a Chapter 11 petition on behalf of McDermott following the approval and entry of a restructuring support agreement which was not presented to shareholders.  Defendants then caused McDermott to publicly disclose for the first time that the Company had liquidity problems that could not be cured outside of the bankruptcy process. McDermott additionally announced that it expected the Company's common stock to be delisted by the New York Stock Exchange ("NYSE").  On this news, trading of McDermott common stock was halted pre-market, and trading did not resume until January 23, 2020.  On January 23, McDermott common stock closed at $0.12 per share, almost an 83% decline from its January 17 closing price.

6.     Pursuant to the Chapter 11 plan of reorganization ("Plan of Reorganization"), McDermott would eliminate over $4.6 billion in debt from its balance sheet, with secured lenders receiving an initial 94% of all of the Company's new equity.  Certain McDermott assets which

Defendants falsely represented to investors would be sold as part of the Company's long-term balance sheet solution, were used to repay the Chapter 11 debtor-in-possession financing package and fund emergence costs.  Under the Plan of Reorganization, McDermott shareholders, including those that purchased shares of McDermott common stock during the Class Period and were told to ignore rumors of an imminent bankruptcy, were to be eliminated as equity owners of the Company.

7.      McDermott management, including Defendants, however, were to keep their jobs and retention bonuses paid to them in connection with the bridge financing obtained to extend McDermott's time to prepare the prepackaged plan of reorganization.  In addition, management will receive up to 7.5% of new equity in McDermott after the Company emerges from bankruptcy.

8.      On June 30, 2020, McDermott announced in a press release that the Company successfully completed its restructuring process. In a Form 15 filing on the same date to terminate the registration of McDermott common stock, McDermott disclosed that the Plan of Reorganization became effective, the Company emerged from bankruptcy, and "[a]ll previously issued and outstanding equity interests in the Company … were automatically cancelled and extinguished …."

## II.      JURISDICTION & VENUE

9.      The federal claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Securities Act, 15 U.S.C. § 78aa.

11.     This Court has personal jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because McDermott's U.S. headquarters are located within this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

13.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

### A.     Plaintiffs

14.     Plaintiffs John Arden Ahnefeldt, Robert Brower, Jr., Robert Brower, Sr., Khanh L. Bui, Jignesh Chandarana, Krutika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, and Alexandre Tazi ("Plaintiffs") are members of the Coligado Shareholder Group that objected to the Disclosure Statement and Pre-Packaged Chapter 11 Plan of McDermott in the Bankruptcy Proceeding and obtained relief from the Bankruptcy Court determining that Plaintiffs "timely and effectively opted out of the Third-Party Releases contained in the Plan and th[e] Confirmation Order."  Bankr. Proc. ECF No. 684 at 83 (¶ 79).

15.     As set forth in the certifications annexed hereto in Exhibit A, Plaintiffs purchased McDermott common stock and call options of or guaranteed by McDermott on the open market during the Class Period and suffered damage as a result of the misconduct alleged herein.

**B.     Defendants**

16.     Defendant David Dickson ("Dickson") has served as President, Chief Executive Officer ("CEO") and member of the Board of Directors of McDermott since December 2013.

17.     Pursuant to the Company's Annual Report of Form 10-K/A for the fiscal year ended December 31, 2019 (filed with the SEC on April 24, 2020) ("2019 Annual Report"), Dickson earned a base salary of $1,125,000 in 2019 from McDermott, and total compensation of $12,406,571.   Dickson also obtained a $3.375 million retention bonus from McDermott ($2,250,000 of which is reflected in his total compensation for 2019) in connection with the bridge loan secured by the Company in October 2019.

18.     Defendant Stuart A. Spence ("Spence") served as Executive Vice President and Chief Financial Officer ("CFO") of McDermott from August 2014 until his resignation in November 2019.   As CFO of McDermott until or about November 5, 2019, Defendant Spence was responsible for, supervised, oversaw, and had ultimate authority over the preparation of the financial information incorporated in the Company's public filings and press releases during that time, including information regarding the Company's liquidity state.

19.     According to the 2019 Annual Report, Spence's base salary was $546,591 in 2019 from McDermott, and total compensation of $4,302,027.   Spence resigned from McDermott following the announcement of the Company's third quarter 2019 earnings.   Spence obtained severance of over $866,667.67 consisting of the remainder of his retention bonus ($433,333 of which is reflected in his total compensation for 2019) in connection with the bridge loan secured by the Company in October 2019.

20. Defendant Christopher A. Krummel ("Krummel") has served as Executive Vice President and Chief Financial Officer ("CFO") of McDermott since Defendant Spence's resignation in November 2019. As CFO of McDermott after November 5, 2019, Defendant Krummel was responsible for, supervised, oversaw, and had ultimate authority over the preparation of the financial information incorporated in the Company's public filings and press releases during that time, including information regarding the Company's liquidity state. Prior to his service as CFO, Defendant Krummel served as Global Vice President, Finance and Chief Accounting Officer of McDermott.

21. According to the 2019 Annual Report, Krummel earned a base salary of $391,409 in 2019 from McDermott, and total compensation of nearly $1,197,039. Krummel also obtained a $267,750 retention bonus from McDermott in connection with the bridge loan secured by the Company in October 2019.

22. Defendants: (a) directly participated in the management of McDermott; (b) were directly involved in the day-to-day operations of McDermott at the highest levels; (c) were privy to confidential, proprietary information concerning McDermott and its business and operations; (d) were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) were aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning McDermott during the Class Period; and/or (g) approved or ratified these statements in violation of the federal securities laws.

23. Because of their positions with McDermott, Defendants possessed the power and authority to control the contents of the Company's quarterly reports and press releases.

Defendants were provided with copies of McDermott's reports and press releases alleged herein to be misleading prior to or shortly after their issuance.

24.     As members of the management team at McDermott, Defendants directly participated with McDermott's financial and legal advisors in the day-to-day planning and execution of the prepackaged Chapter 11 filing and, thus, possessed contemporaneous knowledge of the facts alleged herein.

## IV.     RELEVANT NON-PARTY

25.     Relevant Non-Party McDermott is a Panamanian corporation with its principal executive offices located at 757 North Eldridge Parkway, Houston, Texas 77079.  At all relevant times herein until delisted, McDermott common stock traded on the NYSE under the ticker symbol "MDR."

26.     On December 13, 2019, the Company issued a press release stating that it had received a notice of noncompliance from the NYSE and that it intended to cure the deficiency.

27.     On January 21, 2020, McDermott announced that it had the support of more than two-thirds of all its funded debt creditors for a restructuring transaction that will equitize nearly all the Company's funded debt, eliminating over $4.6 billion of debt.  On the same day, McDermott solicited votes from its lenders and bondholders in support of the prepackaged Plan of Reorganization and commenced the prepackaged Chapter 11 proceedings.  McDermott was delisted from the NYSE on February 17, 2020.

28.     McDermott's restructuring plan, which was approved by the Bankruptcy Court on March 12, 2020, provides for the "cancellation of all existing preferred and common equity interests."

## V.      ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.      Background

29.      At all relevant times, McDermott has described itself as a "premier, fully-integrated provider of technology, engineering and construction solutions to the energy industry," that designed and built "end-to-end infrastructure and technology solutions to transport and transform oil and gas into the products the world needs today." Its corporate website states, "Customers rely on McDermott to deliver certainty to the most complex projects, from concept to commissioning. We call it the 'One McDermott Way.'"

30.      McDermott's website states that it operates in 54 countries, employs more than 40,000 people, and uses a "diversified fleet of specialty marine construction vessels and fabrication facilities around the world."

31.      Traditionally, McDermott focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies.

32.      McDermott was a healthy, profitable company, and reported 2017 revenue of almost $3 billion and net income of more than $178 million.

### B.      McDermott Bankruptcy

33.      On January 21, 2020, contrary to all public indications by the Company, McDermott disclosed that it commenced soliciting votes from its secured lenders and bondholders in support of a prepackaged Chapter 11 Plan of Reorganization to be filed with an expedited schedule in the United States Bankruptcy Court for the Southern District of Texas that same day.  As described by McDermott, the reorganization was to be financed by a debtor-in-possession ("DIP") facility of $2.81 billion, subject to Bankruptcy Court approval, committed

9

exit financing of over $2.4 billion in letter of credit facility capacity, and will emerge from Chapter 11 with approximately $500 million in funded debt.

34.     As part of the restructuring transaction, McDermott announced that its subsidiaries had entered into a share and asset purchase agreement with a joint partnership between The Chatterjee Group and Rhône Group pursuant to which the joint partnership will serve as the "stalking-horse bidder" in a court-supervised sale process for Lummus Technology ("Lummus") for a base purchase price commitment of $2.725 billion.

35.     Further, McDermott's public shareholders were to be eliminated in connection with the bankruptcy and its common stock cancelled as part of the restructuring.

36.     The Plan of Reorganization, however, provided that all of management (including Defendants) be retained and given up to 7.5% in new equity in the Company upon emergence from bankruptcy.  In addition, members of management that were paid a portion of retention bonuses authorized by the Board of Directors on October 17, 2019 (described below) were paid the balance of the bonuses prior to the Chapter 11 filing.

37.     On March 12, 2020, the Bankruptcy Court approved the Plan of Reorganization, including the cancellation of McDermott common stock.

38.     On June 30, 2020, the Plan of Reorganization became effective and McDermott emerged from bankruptcy.  All previously issued and outstanding equity interests in McDermott, including its common stock, were automatically cancelled and extinguished.

**C.     Defendants' False and Misleading Statements and Omissions during the Class Period**

39.     On September 20, 2019, Defendants caused McDermott to issue a press release titled *McDermott To Explore Strategic Alternatives for Lummus Technology* (*available at* https://www.prnewswire.com/news-releases/mcdermott-to-explore-strategic-alternatives-for-

lummus-technology-300922266.html (last visited June 18, 2020)), announcing that it recently received unsolicited approaches to acquire all or part of Lummus Technology ("Lummus"), McDermott's industry-leading technology business with a valuation exceeding $2.5 billion.  The press release sets forth, in relevant part, as follows:

> HOUSTON, Sept. 20, 2019 /PRNewswire/ -- McDermott International, Inc. (NYSE: MDR) today *announced it recently received unsolicited approaches to acquire all or part of Lummus Technology, McDermott's industry-leading technology business, with valuation exceeding $2.5 billion. Based on the receipt of these approaches, McDermott is exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through*.

> McDermott's Lummus Technology is a leading licensor of proprietary petrochemicals, refining, gasification and gas processing technologies, and a supplier of proprietary catalysts and related engineering. With a heritage spanning more than 100 years, encompassing approximately 3,100 patents and patent applications, Lummus Technology provides one of the industry's most diversified technology portfolios to the hydrocarbon processing sector.

> "Lummus is an excellent business, with incredibly impressive employees, that has earned a reputation for expertise, innovation and reliability in the refining and petrochemical industries," said David Dickson, President and Chief Executive Officer of McDermott. "*The process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure, and we plan to use the proceeds from any transaction involving Lummus Technology to strengthen our balance sheet. While Lummus is an important business within McDermott, we have decided to undertake a process to fully realize its strategic and financial value*."

> Separately, McDermott's previously announced processes to sell the remaining portion of its pipe fabrication business and its industrial storage tank business are ongoing.

> McDermott has retained Evercore as the lead advisor on the strategic alternatives process for Lummus Technology.[1]

40.     This disclosures regarding the unsolicited approaches to acquire Lummus and that McDermott would use the proceeds from any Lummus transaction to strengthen its balance sheet was well received by the market.  At the time, McDermott was struggling with its debt load

---

[1] Unless otherwise noted, all emphasis is added.

following a series of strategic acquisitions. Zephirin Group analyst Lenny Zephirin said the offer is "salivating" and, if accepted, should allow the company to reduce leverage by about $1.2 billion. *See* A. Sarkar, *McDermott International gets takeover interest for its Lummus Technology unit*, Reuters, Sept. 20, 2019, *available at* https://www.reuters.com/article/us-mcdermott-international-strategic-alt/mcdermott-international-gets-takeover-interest-for-its-lummus-technology-unit-idUSKBN1W51AC (last visited June 18, 2020). Credit Suisse analysts, who called Lummus the "crown jewel" of McDermott, said the valuation is reasonable given historic transactions in the space, and that the deal could happen in early 2020. *Id.* Following the disclosure, the price for McDermott common stock spiked 50% in premarket trading on September 20 and closed at $2.01 per share, up 27.22%. *See* Chart (annexed hereto as Exhibit B).

41.     The September 20 press release and Defendant Dickson's statements therein, however, were materially misleading. There was not any near-term plan for a Lummus transaction to strengthen the Company's balance sheet. The statements were merely part of Defendants' scheme to artificially inflate the price of McDermott common stock and provide the Company time to develop and execute on a prepackaged Chapter 11 restructuring plan, while countering negative news (McDermott's engagement of AlixPartners, LLP ("AlixPartners") just two days prior) that cratered the Company's share price and would have resulted in a freefall Chapter 11 filing.[2]

_____

[2] McDermott engaged AlixPartners pursuant to an agreement dated September 17, 2019. *See* Bankr. Proc. ECF No. 916 at 1 (¶1).  In response to September 18, 2019 news reports regarding the engagement of AlixPartners, McDermott issued a statement on the same date that set forth, in relevant part, as follows: "McDermott International, Inc. … routinely hires external advisors to evaluate opportunities for the Company. The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet." *McDermott Statement* (*available at* http://www.mcdermott-investors.com/news/press-release-details/2019/McDermott-Statement/default.aspx (last visited June 18, 2020)).

42.     As confirmed by John R. Castellano, AlixPartners Managing Director and Chief Transformation Officer for McDermott, in his January 22, 2020 Declaration in support of Debtors' First Day Motions:

> In early September 2019, AlixPartners was retained by McDermott to assist with liquidity management and review certain construction projects that were incurring significant losses and determine the impact of such losses on McDermott's business plan. *Almost immediately, McDermott asked AlixPartners to pivot to contingency planning, as it became clear that liquidity was an acute issue. My personal involvement began thereafter in late September because McDermott potentially needed an officer to help lead a comprehensive restructuring.* At that time, McDermott's efforts to raise additional liquidity through a sale of its "Tank" and Pipe Fabrication assets or a junior capital raise were faltering, and McDermott's vendor base was beginning to resist efforts to further stretch account payable balances. While McDermott had significant amounts of cash on their balance sheet, much was trapped within McDermott's joint venture operations. This created an acute liquidity crisis.

> ***On September 18, 2019, news leaked that McDermott had engaged AlixPartners. The market reacted swiftly, with shares plunging over 60%. McDermott had to calm the markets and its increasingly agitated vendor base. Two days later, McDermott announced its plan to market and sell the "Tech" asset***, a process McDermott had previously contemplated. ***The market welcomed the news of the sale, and McDermott's shares rose approximately 50% the following day***. During that period, ***McDermott even received an unsolicited offer for the Tech asset in excess of $2.5 billion***.

> *At that point, a freefall chapter 11 filing would have been disastrous to McDermott's business ….. To manage liquidity, McDermott had stretched its vendor base to unsustainable level* ….. Delays in settling obligations with vendors caused significant operational issues, in many cases bringing projects to a halt or severely impacting project schedules. Customers and key suppliers became dissatisfied, resulting in broad, compounding negative effects on McDermott's profitability, as project disruption and timeline extensions for completing projects resulted in increased carrying costs and a delayed revenue realization. … *In many instances, McDermott's vendors have a direct line of communication to its customers. These vendors have communicated their displeasure with McDermott's payment practices, which has strained relations with the customer base.*

> *Filing without a plan would have risked already-strained vendor and customer relationships, made it virtually impossible for McDermott to win additional work, and prompted customers to draw on their letters of credit. It was becoming clear that McDermott's secured lenders were the only viable source of "emergency"*

*capital; accordingly, McDermott promptly engaged in negotiations on a potential superpriority financing facility.*

*Initially, the secured lenders resisted McDermott's requests for additional capital. They needed to understand for themselves why filing for chapter 11 without a plan would be hugely detrimental to the business. Over a few week period in October, McDermott* provided a flurry of diligence, conducted many multi-day in-person meetings and negotiation sessions in New York, and *started to document the structure for a superpriority financing facility that would allow sufficient time to explore consensual restructuring alternatives. The secured lenders ultimately supported such a superpriority financing facility.*[3]

43.     Mr. Castellano later testified that when he began working with Defendants, McDermott, and their advisors in September 2019, the objective was to negotiate a consensual Chapter 11 reorganization as this was the only viable option McDermott had:

Q I'd like to first discuss the debtor's proposed plan. Were you involved in negotiations of the plan?

A I was.

Q How would you describe those negotiations?

A So over the course – beginning in September of 2019 – I joined towards the end of the month – the AlixPartners team had started earlier in the month, focusing on initially liquidity management and evaluating some of the projects. Well, it became very apparent that the company needed to turn to contingency planning, and they were going to request the need for an officer to help lead the restructuring process.

So, *starting in late September 2019, I began working with the Company, the management team, Kirkland – Kirkland & Ellis, Evercore, and then all of the financial and legal advisors of the three constituents that we were negotiating a – hopefully to negotiate a plan – a consensual plan of reorganization.*

…

Q When AlixPartners got involved, what did you observe was causing the [C]ompany's liquidity challenges?

A There was a number of issues. When we joined, it was clear that there were needs for liquidity. Mr. Shah had just referenced when he was retained to help search for some additional liquidity. We were involved with trying to understand exactly what the best path is to assist on a short-term basis. *And the liquidity*

---

[3] Castellano Decl. (ECF No. 62), ¶¶ 8-12, 14.

*challenges really impacted the [C]ompany's vendor base. They had to significantly stretch payment terms to vendors, which are critical to the [C]ompany's day-to-day operations*, roughly over 10,000 vendors, global in nature, many of them very local to individual projects. *And the ability to continue to maintain its business yet stretch its vendor base really became – really became just impossible for the [C]ompany to deal with.*

…

Q And once AlixPartners got involved, what other options did the [C]ompany consider pursuing?

A Yes. So we quickly noted that being able to stretch the vendor base while we were trying to figure out what the path forward was was [sic] really going to be virtually impossible. ***We quickly worked with the [C]ompany and its advisors, realizing that the only lenders that could provide some form of bridge financing, which we felt was the right solution, as opposed to trying to file Chapter 11 on a very immediate basis to obtain debtor in possession financing without a plan, we realized that we needed to work with our existing lender base, because that was really the only option the [C]ompany had. And we began embarking on that process, effectively, towards the end of September.***

Q And where did that process end up?

A *So over the course of the next – from that point in time, we were able to educate the lenders that a consensual path forward would be the best option to maximize value for all the constituents*, recognizing that the situation was very dire. While – our existing secured lenders were reluctant initially, but we were able to go through a significant amount of diligence in a very short period of time, ***which led to the bridge financing, which we closed on October 21st, 2019.***

Q ***Once the bridge financing was in hand, did the debtors have any viable alternatives to Chapter 11***?

A There really weren't, other – ***there really weren't any other options at all, other than restructuring.***[4]

44.    Christopher T. Greco, one of the counsel for McDermott, similarly represented to

the Bankruptcy Court:

I want to take the Court first through the last four months and the events leading to the filing and the restructuring negotiations, how that came together. …

---

[4] Mar. 12, 2020 Bankruptcy Proceeding Hearing Tr. (Bankr. Proc. ECF No. 690) ("Mar. 12 Tr.") at 123:6-21, 124:23-125:12, 126:2-127:3.

Your Honor, Mr. Sussberg left off *in September of 2019*, and as he mentioned, *the [C]ompany had recently hired Evercore, AlixPartners, and Kirkland to assist with these restructuring efforts*. …

And then, as Mr. Sussberg just outlined, *there were leaks and there were continued strains on the [C]ompany's liquidity position. And both the equity and the debt quickly traded off and it became apparent that a second lien would not be able to be raised. And so, as we said, Plan Z* [(the Contingency Plan)] *became Plan A.*

*The [C]ompany had an urgent need for liquidity in late September and we did a few things. First, we tried to help organize our secured creditors and our unsecured creditors*, and they did in fact organize, loosely speaking, although it's an incredibly complex capital structure, there were really three groups. There was the term loan lender group and Mr. Schaible's here and he'll make some remarks in a second representing them.

There was the LC lenders/revolving lenders, and that's the Linklaters and Bracewell group of banks. And they would – they had a drawn revolver, and they also had LC exposure. And then there were the bond holder group that organized and eventually – and I'll get to this – Brown Rudnick came into the picture a month or two later. *So we organized our creditors and we quickly said, we're running out of cash. We need an infusion of liquidity. And they said, well, why shouldn't we do this through Chapter 11.*

*And we said, well, because we don't have an agreement yet, and this is important theme and it was a theme in the entire fall which was that our belief was that this business is an incredibly fragile business and there would be significant value destruction if this went into a Chapter 11 without a deal.*[5]

45.     Even if Defendants had intended to complete a near-term transaction for Lummus

outside of the bankruptcy process when the September 20 press release was issued (they did not),

Defendants knew that the proceeds from any transaction would not be sufficient to address the

Company's immediate liquidity needs:

[A]fter exploring the available offers to consummate the [Lummus] Sale, *McDermott realized that taking action … at the time would not fully address McDermott's immediate liquidity needs*. Based on the actionable offers received, *any proceeds that would have a material effect on McDermott's operations would not be realized until up to six months after the closing of any out-of-court sale. Further*, while a 100 percent sale of the Technology Business would fully repay

---

[5] Jan. 23, 2020 Bankruptcy Proceeding Hearing Tr. (Bankr. Proc. ECF No. 213) ("Jan. 23 Tr.") at 41:15-43:12.

the Superpriority Financing (as defined herein), *absent a comprehensive balance sheet solution, the pro forma business would retain significant challenges*, including: (i) unsustainably high leverage remaining following the sale, (ii) the failure of the sale to alleviate McDermott's unfunded credit requirements pursuant to existing LC's, bilateral facilities, and surety bonds, (iii) increased future LC needs as existing letters of credit under the Superpriority Facility roll off, causing the termination of the letter of credit facility under the Superpriority Financing, (iv) the lack of significant, and much needed, liquidity, as any sale proceeds would be required to pay down funded debt, and (v) the failure of the sale to alleviate McDermott's stretched vendor base.

***Accordingly, McDermott and its advisors** … **concluded that an emergency injection of liquidity on a superpriority basis was necessary to stem the accumulation of trade claims and bridge to an in-court process*** where McDermott could (i) deleverage its business, (ii) realize maximum value for its Technology Business (and other potential asset sales) and negotiate with all potential buyers from a position of strength, and (iii) obtain additional liquidity and LC support that would allow McDermott to execute on its Business Plan.[6]

46.     In his Declaration in Support of Chapter 11 Petitions, Defendant Dickson confirmed his contemporary knowledge of the acute liquidity crisis and the Company's only feasible option to avoid a liquidation:

In late September 2019, we were running out of cash. It became clear that despite McDermott's improvements and success winning projects, the company remained over-leveraged and could not continue running its business and servicing its debt. As a first step, *to avoid liquidating the company, we obtained on an emergency basis a significant liquidity infusion through a superpriority financing facility*. We received the first tranche of the superpriority financing on October 21, 2019, and took advantage of the additional time to reassess our operations and financial condition.[7]

47.     Thus, Defendants knew that the statements in the September 20 press release were materially false and/or misleading when made, but nonetheless approved them for public distribution.  These statements had the principal purpose and effect of creating a false appearance of fact insofar as they were intended to calm investors and McDermott's agitated vendor base.

---

[6] Castellano Decl. ¶¶ 83-84.

[7] Dickson Decl. (Bankr. Proc. ECF No. 29), ¶ 16.

As intended, immediately following the issuance of the September 20 press release, the market price for shares of McDermott common stock spiked upwards.

48.     On October 21, 2019, Defendants caused McDermott to announce in a Form 8-K filing that it had entered into a $1.7 billion Superpriority Senior Secured Credit Agreement ("SSSCA") with four tranches of funding.  McDermott disclosed that the first tranche would be immediately available for a $550 million loan and $100 million letter of credit, and the other three would be accessible upon the Company's meeting certain conditions.  The Form 8-K filing stated that McDermott would use the funding to finance working capital and support the issuance of required performance guarantees on new projects.

49.     The Form 8-K filing stated that on October 21, 2019, the Board of Directors of McDermott appointed John R. Castellano, Managing Director at AlixPartners, and an authorized representative of AP Services, LLC ("AP Services"), to act as McDermott's Chief Transformation Officer.  According to the filing, Mr. Castellano was appointed "pursuant to a requirement in the [SSSCA] as a condition to providing the funding thereunder."

50.     The Form 8-K filing, however, did not disclose that the principal purpose of the SSSCA was to allow for sufficient time to negotiate a consensual Chapter 11 restructuring or avoid liquidating the Company.

51.     In the press release annexed to the Form 8-K, Defendants caused McDermott to disclose that it "continue[d] to pursue the previously announced strategic alternatives process for Lummus Technology …."

52.     The SSSCA (annexed as an exhibit to the Form 8-K filing) set forth specific business plan milestones in connection with the purported sale of Lummus.  Unless waived by the Company's secured lenders that were party to the SSSCA, McDermott was required to, among other things:

a.      Solicit first round bids for the sale or other disposition of all or substantially all of the assets of Lummus from potential buyers by November 27, 2019;

b.      Deliver a report to the secured lenders' advisors reflecting the first round bids by December 15, 2019;

c.      Deliver a draft purchase agreement in form and substance satisfactory to the secured lenders' advisors with respect to the Lummus sale by December 31, 2019; and

d.      Enter into a purchase agreement with respect to the sale of Lummus by January 31, 2020.

53.      According to filings in the Bankruptcy Proceeding, these business plan milestones did not reflect the marketing process already underway by McDermott for the sale of Lummus. Indeed, any transaction that involved Lummus would be accomplished only as part of a Chapter 11 restructuring plan.

54.      McDermott's Amended Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interests, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order (Bankr. Proc. ECF No. 110) describes the marketing of Lummus as follows:

> Beginning in late September, 2019, [McDermott] commenced a two-phase marketing process to ensure the sale of [Lummus] would be on the highest and best terms available. During Phase I, [McDermott's] proposed financial advisor, Evercore L.L.P., interacted with 58 potential buyers, including 34 financial investors and 24 strategic investors. Of the potential buyers contacted, 28 executed non-disclosure agreements and were provided with a first round due diligence package which included the Confidential Information Memorandum,

third-party commercial and financial diligence reports and access to a secure data room. … Pursuant to Phase I, [McDermott] received 14 bids from potential purchasers (7 financial bids and 7 strategic bids), including one bid that was received late during Phase II.

*As discussions with [McDermott's] key stakeholders progressed and it became clear a sale of [Lummus] would be a key component of any restructuring, [McDermott] determined to select a potential buyer to act as a stalking horse bidder and consummate the sale in a chapter 11 case.* To facilitate a potential stalking horse bid, [McDermott] distributed a Phase II process letter to 7 potential purchasers and conducted further, in-depth diligence with the potential purchasers. *Phase II ultimately culminated, on December 16, 2019, in 5 potential purchasers submitting refined bids, each of which indicated an interest in serving as a stalking horse bidder in a chapter 11 sale process.* …

55.     At no point prior to the end of the Class Period did Defendants cause McDermott to amend its prior public disclosures regarding the sale process for Lummus to make them not false and/or misleading.

56.     While McDermott used the new financing to afford it time to negotiate a consensual Chapter 11 restructuring, Defendants also used these same proceeds to pay themselves and other senior executives at the Company significant retention bonuses.

57.     The October 21 Form 8-K filing disclosed that the Board of Directors approved a Retention Bonus Award Agreement on October 17, 2019 whereby: (i) Defendant Dickson would receive a $3.375 million bonus as President and Chief Executive Officer; (ii) Defendant Spence would received a $1.3 million bonus as Executive Vice President and Chief Financial Officer; and (iii), and Samik Mukherjee would receive a $1.4 million bonus as Group Senior Vice President, Projects.  One third of the bonus was paid out upon entry of the SSSCA, with another third paid out upon the funding of Tranche B, and the last third upon the funding of Tranche C. The 2019 Annual Report disclosed that Defendant Krummel received $267,750 as an executive officer of McDermott.

58.     On October 22, 2019, McDermott and AP Services, an affiliate of AlixPartners, entered into an agreement (the "October 22 Agreement") that replaced the September 17 agreement between McDermott and AlixPartners, wherein AP Services agreed "to provide temporary personnel to McDermott to assist in a contemplated financial restructuring."  Bankr. Proc. ECF No. 916 at 1 (¶1).  Among other things, the October 22 Agreement provided for the payment of *a $5 million success fee*, *id*., "earned upon the earliest to occur of any of the following: (a) *completion of a restructuring through confirmation of a chapter 11 plan of reorganization*, (b) the consummation of any out-of-court recapitalization or restructuring (through a single transaction or series of transactions) of the majority of [McDermott's] debt, or (c) consummation of one or more transactions, in any form, that effectively transfers a majority of the business as a going concern to another entity or entities."  Bankr. Proc. ECF 434-1 at 9 (¶22).

59.     At no point prior to the end of the Class Period did Defendants cause McDermott to disclose the October 22 Agreement.

60.     On November 4, 2019, McDermott announced its third quarter 2019 results, reporting revenues of $2.1 billion, a net loss of $1.9 billion or $10.37 per diluted share, and a third quarter operating loss of $1.7 billion.

61.     On the same day, McDermott filed a Form 10-Q for the quarterly period ended September 30, 2019 with the SEC that was signed by Defendant Krummel, and included certifications by Defendants Dickson and Spence: (a) that the filing did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and (b) pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) and Section 906 of the Sarbanes-Oxley Act of 2002.

62.     In the Form 10-Q filing, McDermott disclosed *for the first time* that it was being investigated by the SEC.  Significantly, McDermott was notified by the SEC in July 2019 (by a letter dated July 26, 2019 together with an accompanying subpoena) that it was conducting an investigation related to disclosures made by the Company concerning the reporting of projected losses associated with the Cameron LNG project.

63.     At no prior time did Defendants cause McDermott to disclose to investors the existence of the SEC's investigation.

64.     In the section of the Form 10-Q filing under the heading "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations," McDermott stated the following:

> If, in the future, we are unable to access any of Tranche B, Tranche C or Tranche D under the [SSSCA], we may be in an immediate liquidity crisis, and, unless we are able to secure additional financing, we would not be able to pay liabilities as they become due, which would lead to events of default under the [SSSCA], the Credit Agreement, the Letter of Credit Agreement and the Senior Notes Indenture. *An event of default under any of those documents could result in the acceleration of substantially all of our indebtedness, which would create the imminent need to file for protection under Chapter 11 ….*

65.     Under the heading "Item 1A.  Risk Factors," McDermott disclosed that: "We *may* be compelled to seek an in-court solution, potentially in the form of a pre-packaged or pre-arranged filing under Chapter 11 … if we are unable to successfully negotiate a timely out-of-court restructuring agreement with our creditors."

66.     Nothing in the Form 10-Q filing corrected or negated any prior disclosures by Defendants and McDermott regarding the Company's plans for the near-term sale of Lummus or the fulfilment of the business plan milestones under the SSSCA to effect such sale.

67.     The statements in the Form 10-Q that describe a Chapter 11 filing as a risk McDermott *might* face as a result of a default on any of the agreements with its secured lenders

or inability to timely negotiate a restructuring agreement were materially false and misleading when made because, as described above, Defendants, McDermott, and their advisors were then already negotiating a consensual plan of reorganization, starting in late September.  Moreover, the SSSCA executed in October was intended by all parties involved as a bridge to that "in-court process."

68.     On November 5, 2019, McDermott announced in a Form 8-K filing that Defendant Spence resigned from his positions as Executive Vice President and CFO at the Company, effective November 4, and that Defendant Krummel was appointed as the new Executive Vice President and CFO.

69.     On December 2, 2019, Defendants caused McDermott to disclose in a press release titled *McDermott to Access $350 Million Tranche B Financing Under Superpriority Senior Secured Credit Facility*, (*available at* https://www.prnewswire.com/news-releases/mcdermott-to-access-350-million-tranche-b-financing-under-superpriority-senior-secured-credit-facility-300967358.html (last visited June 18, 2020)), that it was granted access to the second tranche of funding (Tranche B) under the SSSCA, whereby the Company received a $250 million Term Loan Facility and a $100 million Letter of Credit Facility.  As with Tranche A, the press release stated that McDermott would use the proceeds "to continue financing working capital and support the issuance of required performance guarantees on new projects." *Id*.  Defendants also caused McDermott to reiterate its continued pursuit of "the previously announced strategic alternatives process for Lummus …." *Id*.

70.     The December 2 press release, however, was materially false and misleading when made because it omitted to disclose that the Company's secured lenders would not provide any further liquidity under the SSSCA to fund business operations, and that the sale of Lummus would be consummated only as part of a Chapter 11 process:

On December 1, 2019, after significant deliberation and discussion with the secured lenders on whether to fund the second tranche under a debtor-in-possession financing facility rather than on an out-of-court basis, McDermott gained access to the second tranche of funding under the Superpriority Facility providing an incremental $250 million term loan facility ($229 million after fees) and a $100 million letter of credit facility. *In connection with this funding, the secured lenders stated that they did not expect to fund any additional amounts on an out-of-court basis. As such, McDermott's liquidity would drive the timing of any potential chapter 11 filing.*

*McDermott told prospective purchasers of [Lummus] that the purchase was to be consummated as part of a chapter 11 process, and provided clear milestones for the marketing process with the aim of achieving a signed "stalking horse" purchaser by the time McDermott would need to seek chapter 11 relief.*[8]

71.    Defendants' deception continued through January 2020.  On January 7, Plaintiff Gad emailed Scott Lamb, Vice President of Investor Relations at McDermott, regarding McDermott bankruptcy rumors circulating in the media.  The email sets forth, in relevant part, as follows:

My name is Danny. I am previously a CB&I shareholder. After the merger as we all know this has been a really tough couple of years.

I was hoping maybe to get information about this Bloomberg/WSJ stating you guys are in talks with HPS Investments & Baupost Group *for a 2 billion loan to operate during which you guys will be filing for bankruptcy in the next couple of weeks.* When I heard this statement, it made me cringe and made me very upset. *I am praying that this article is not accurate. Can you please refreshen up the air for me and give me something that will help me sleep at night. Also any* progress about the upcoming Jan 15 deadline negotiations, and *progress on LUMMUS sale if the company is still seeking to do so.*

Thanks and much appreciated,

Danny G

72.    A little more than an hour later, Mr. Lamb responded by email as follows:

We did not comment on the WSJ story because it essentially repeated information that has been in the market for some time, specifically that 1) we continue to have discussions with our debt holders about the best path forward, and 2) *bankruptcy remains a risk, as outlined in our Q3 10-Q. We viewed other details of the WSJ*

---

[8] Castellano Decl., ¶¶23-24.

*article as rumor and speculation – and we don't usually comment on that kind of conjecture either.*

*The Lummus sale process is ongoing.*

No specific updates to offer regarding the pending Jan 15 expiration of the forbearance agreement.

Regards

Scott

73.     None of this was true.  A consensual Chapter 11 filing was imminent and not a mere risk.  According to Defendant Dickson, "McDermott and [its] advisors ha[d] ***engaged in months of nearly around-the-clock negotiations with all of [its] stakeholders*** regarding the terms of a restructuring transaction …."[9]  Those negotiations focused on: "(i) ensuring adequate LC [(letter of credit)] availability in the immediate term, during the chapter 11 cases, as well as in the long run following emergence from bankruptcy, (ii) sufficient liquidity to provide operating capital to continue performing on current projects, to administer these chapter 11 cases, and to normalize vendor payments, and (iii) deleveraging of McDermott's balance sheet."[10]

74.     Further, there was not any ongoing Lummus sales process; or at least not the one communicated by Dickson to investors in September.

75.     As set forth above, Defendants intended the sale of Lummus to be accomplished as part of a Chapter 11 plan from the outset.  As John Castellano confirmed to the Bankruptcy Court:

McDermott enters chapter 11 with a massively consensual prepackaged restructuring. The plan equitizes nearly all of the company's funded debt and allows all general unsecured claims to be paid in full or ride through unimpaired,

[9] Dickson Decl., ¶ 18.

[10] *Id.* at ¶ 19.

25

permitting McDermott to swiftly emerge from bankruptcy, subject to the Court's approval, with exit financing already in place.

Given McDermott's extraordinarily complex, global business, this result was hardly a foregone conclusion. *Getting here has been an all-out sprint for the company and its many stakeholders around the globe. Since September 2019, McDermott has negotiated for and obtained superpriority financing, avoiding what would have been a freefall chapter 11 filing that could have resulted in immediate liquidation*; delivered a revised business plan; *engaged in extensive diligence and negotiations with its secured lenders and bondholders; marketed and achieved a signed stalking-horse purchaser for the sale of [Lummus]*; and embarked on a successful customer reach out plan.[11]

76.    On January 21, 2020, Defendants caused McDermott to announce in a Form 8-K the Company's entry into a Restructuring Support Agreement in connection with a Joint Prepackaged Chapter 11 Plan of Reorganization.   The press release annexed to the Form 8-K filing sets forth, in  relevant part, as follows:

HOUSTON, Jan 21, 2020 – McDermott International, Inc. (NYSE: MDR) ("McDermott") today announced that it has the support of more than two-thirds of all its funded debt creditors for a restructuring transaction that will equitize nearly all the Company's funded debt, eliminating over $4.6 billion of debt.

The restructuring transaction will be implemented through a prepackaged Chapter 11 process that will be financed by a debtor-in-possession ("DIP") financing facility of $2.81 billion. Subject to court approval, McDermott expects the DIP financing, combined with cash generated by McDermott, to enable the Company to stabilize its cash flows, continue operating in the normal course and fulfill its commitments to key stakeholders, including customers, suppliers, joint-venture partners, business partners and employees.

The Company also has secured committed exit financing of over $2.4 billion in letter of credit facility capacity and will emerge from Chapter 11 with approximately $500 million in funded debt. The restructuring transaction will strengthen the Company's balance sheet, normalize its trade debt and position the Company for long-term growth.

All of McDermott's businesses are expected to continue to operate as normal for the duration of the restructuring. McDermott expects to continue to pay employee wages and health and welfare benefits, and to pay all suppliers in full. All customer projects are expected to continue uninterrupted on a global basis.

---

[11] Castellano Decl., ¶¶ 5-6.

This morning, the Company commenced solicitation of votes from its lenders and bondholders in support of a prepackaged Chapter 11 Plan of Reorganization ("the Plan"). The Company intends to commence the prepackaged Chapter 11 filing in the U.S. Bankruptcy Court for the Southern District of Texas ("the Court") later today. The Company's support from all of its creditor constituencies is memorialized in a Restructuring Support Agreement. The Company plans to move swiftly toward Court approval of the Plan, with confirmation expected within approximately two months from filing.

As part of the restructuring transaction, subsidiaries of McDermott have entered into a share and asset purchase agreement (the "Agreement") with a joint partnership between The Chatterjee Group and Rhône Group (the "Joint Partnership") pursuant to which the Joint Partnership will serve as the "stalking-horse bidder" in a court-supervised sale process for Lummus Technology.

*Under the terms of the Agreement, the Joint Partnership has agreed, and is committed, to acquire Lummus Technology for a base purchase price of $2.725 billion. McDermott will have the option to retain or purchase, as applicable, a 10 percent common equity ownership interest in the entity purchasing Lummus Technology.* McDermott expects to hold an auction in approximately 45 days to solicit higher or better bids for the Lummus Technology business. Either the Joint Partnership or the winning bidder at the auction will purchase Lummus Technology as part of the Chapter 11 process, subject to regulatory and court approval.

*Proceeds from the sale of Lummus Technology are expected to repay the DIP financing in full, as well as fund emergence costs and provide cash to the balance sheet for long-term liquidity.*

*"The restructuring transaction, which has the full support from all of our funded creditors, including our unsecured bondholders, is further recognition of McDermott's fundamentally solid operating business and proven strategy,"* said David Dickson, President and Chief Executive Officer of McDermott. "Our record backlog, the majority of which has been booked in the last two years, and high rate of new project awards demonstrates our customers' continued confidence in our business, the demand for our skills and our long-term opportunities ahead."

Mr. Dickson continued, *"This financial restructuring will create a sustainable capital structure that matches the strength of our operating business.* As a result of the transaction, we are eliminating over $4.6 billion in debt from our balance sheet and we will emerge with robust liquidity and significant financing to execute on customer projects in our backlog. Throughout this process, which we expect to complete expeditiously, McDermott will continue all business operations as normal and deliver on our commitments to our customers. I would like to thank our customers, employees, suppliers and partners for their ongoing dedication, and our lenders for their continued collaboration in reaching this comprehensive and definitive balance sheet solution. McDermott will emerge a

stronger, more competitive company with a solid financial foundation, and we will build upon our reputation as a premier, fully integrated provider of technology, engineering and construction solutions to the energy industry."

As a result of the upcoming Chapter 11 filing, McDermott expects to be delisted from the New York Stock Exchange within the next 10 days. McDermott common stock will continue to trade in the over-the-counter marketplace throughout the pendency of the Chapter 11 process. The shares are proposed to be cancelled as part of McDermott's restructuring.

77.     On January 17, 2020, the price for McDermott common stock closed at $0.70 per share.  After disclosing the plan to restructure through a Chapter 11 process on January 21, 2020, trading of McDermott common stock was halted pre-market at 7:46 a.m. E.S.T., and trading did not resume until January 23, 2020.  On January 23, McDermott common stock closed at $0.12 per share.  *See* Chart.

### D.      Post-Class Period Events

78.     Following the filing of the Plan of Reorganization, multiple shareholders filed objection letters with the Bankruptcy Court because of specific false and misleading statements made by Defendants personally and through McDermott's public filings.

79.     As one shareholder pointed out:

… I have seen reports suggesting that either management declared significant bonuses for themselves shortly before filing for bankruptcy or that such bonuses are being considered in the restructuring plan. If true, that is truly outrageous. No one should be rewarded for having presided over the demise of a great company like McDermott, ***especially while management was making communications to shareholders and the public assuring that it was successfully dealing with its financial problems and even specifically indicating that it would not be filing for bankruptcy***. ***These communications encouraged investors to stick with the Company and even continue to invest in it*** given indications from management that the condition of the Company was going to turn around.[12]

80.     One shareholder wrote that he received repeated assurances that the Company would not be filing bankruptcy:

---

[12] Letter from Frederick D. Braid (Bankr. Proc. ECF No. 490).

*Over the past two years, McDermott executive management (CEO, COO and CFO) would routinely tell us via town hall meetings and regular email updates* on how well the company was doing and *that our troubled projects were behind us*. *They told us not to listen to public rumors and encouraged us to invest in company stock to show employee commitment* to the market, clients and vendors.

Based on executive management statements I invested $1,146,000 in the company.

*Just weeks before declaring bankruptcy on 21 January 2020, [executive management] once again told investors not to listen to rumors and the company was not declaring bankruptcy*.[13]

81.     Another shareholder wrote:

[T]hroughout fall of 2019, McDermott has communicated an overly optimistic and hence misleading outlook of their situation. At current hearings it has become evident that McDermott's management early on had a solution in view where shareholder value would be wiped out. Despite that, *in their external communication, McDermott repeatedly and in bad faith gave the impression that a sale of Lummus would enable them to resolve the debt situation and avoid bankruptcy*. Indeed, this prospect is the sole reason why many shareholders kept their shares all the way into Chapter 11. *Yes, there were disquieting signs* through Bloomberg, WSJ, Seeking Alpha and other sources. *But they were all dismissed by McDermott as "rumors" on which McDermott "do not comment", while adding encouraging comments like "Lummus sale process is continuing" and "stay tuned"*.[14]

82.     The SEC also filed a limited objection to confirmation of the Plan of Reorganization "because it would release the liability of, and permanently enjoin actions against, non-debtor third parties based on actual fraud, willful misconduct, and gross negligence in contravention of Section 524(e) of the Bankruptcy Code, applicable law in the Fifth Circuit, and public policy."[15]   As noted in the SEC's filing:

[T]he Plan includes third party releases that allow non-debtors to benefit from the [McDermott's] bankruptcy by effectively obtaining their own discharges with

---

[13] Letter from Asad Khan (Bankr. Proc. ECF No. 421).  *Accord* Letter from Chamath Kodituwakku (ECF No. 558) ("Just weeks before declaring bankruptcy on 21 January 2020, they once again told investors not to listen to rumors and *the company was not declaring bankruptcy*.").

[14] Letter from Staffan Bonnier (Bankr. Proc. ECF No. 237).

[15] Limited Objection of the SEC to Confirmation of the Joint Prepackaged Chapter 11 Plan of McDermott and Its Debtor Affiliates (Bankr. Proc. ECF No. 517) at ¶ 1. *See id*. at ¶¶ 10-12.

respect to potential claims arising from past wrongdoing, including violations of the federal securities laws before the Chapter 11 cases. Such provisions are at odds with sound public policy considerations underlying the rights of creditors and investors to pursue legitimate claims against wrongdoers. Moreover, such provisions are particularly concerning here where securities class actions are pending against [McDermott] and certain non-debtor parties, and [McDermott has] publicly stated that [it is] the subject of an SEC investigation.[16]

83.    The SEC urged the Court to modify the release provision to carve out claims based on actual fraud, willful misconduct, and gross negligence.[17]  The SEC noted that the Plan has "an extensive list of 'Released Parties' who will benefit … including the [Company]'s current and former officers, directors, principals, employees, representatives, professionals, and current and former equity holders without showing what consideration is being provided by each released party other than a vague statement regarding their general contributions to restructuring.[18]

84.    The SEC found more troubling that "the Releases here grant immunity for scienter-based behavior, including fraud, willful misconduct, and gross negligence. Because public investors often receive little or no distribution in bankruptcy cases, their only source of recovery may be their ability to pursue claims against wrongdoers. And if misconduct by management contributed to the loss of their investments, they may have meritorious scienter-based claims."[19]

85.    On May 8, 2020, McDermott filed a Form 10-Q for the quarterly period ended March 31, 2020 with the SEC that was certified by Defendants Dickson and Krummel.  In the Form 10-Q filing, McDermott disclosed, in addition to the SEC investigation detailed above, receipt of a notice from the United States Attorney for the Southern District of Texas (by a letter

---

[16] *Id*. at ¶ 2; *see id*. at ¶¶ 20-21.

[17] *Id*. at ¶ 3.

[18] *Id*. at ¶ 7.

[19] *Id*. at ¶ 12.

dated February 25, 2020 together with an accompanying subpoena) that a Federal Grand Jury is conducting a criminal investigation with respect to the Cameron LNG project and requesting various documents including cost forecasts and other financial-related information.

## VI.    SCIENTER ALLEGATIONS

86.    As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued and/or disseminated in the name of McDermott were materially false and/or misleading or omitted to disclose material facts to make them not misleading; knew that such documents or statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such documents or statements as primary violations of the federal securities laws.

87.    Defendants, as the individuals that signed, were quoted in, or orally made the allegedly false and misleading statements described herein, they were obligated to familiarize themselves with the subject matter of those public statements and to speak truthfully. Defendants violated such obligations.

88.    Defendants, as the individuals that certified the SEC filing described above pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) and Section 906 of the Sarbanes-Oxley Act of 2002, were obligated to inquire and investigate, familiarize themselves with the subject matter underlying their certifications, and reassure themselves that the matters they were certifying were accurate and that McDermott was speaking truthfully when it made such disclosures.

89.    While the statements set forth above by Defendants and their agents evidencing that there was never a plan for the out-of-court sale of Lummus to bolster McDermott's balance sheet demonstrate strong evidence of conscious misbehavior or recklessness, motive and opportunity are also evident.

90.     As detailed above, Defendants had significant personal financial motivations, unique to them, to engage in the misconduct alleged herein.

91.     Defendants were motivated by their compensation packages, retention bonuses, and continued employment and took affirmative actions to protect their financial interests.  After news leaked that McDermott had engaged AlixPartners and its share price cratered, Defendants caused McDermott to issue the September 20 press release "*to calm the markets and its increasingly agitated vendor base*," with the knowledge that "a freefall chapter 11 filing would have been disastrous to McDermott's business."

92.     Defendants' scienter is further demonstrated by their non-public communications to employees and shareholders, as described above, and consistent with their goal to "calm the markets" while an orderly bankruptcy was arranged, McDermott's investor relations office gave clear guidance that the fictive Lummus sale process was proceeding when, in fact, Defendants and their advisers had previously concluded that there was no way of avoiding bankruptcy and Lummus would be sold only as part of a bankruptcy.

93.     Defendants secured retention bonuses for themselves out of the proceeds of SSSCA bridge financing obtained to allow McDermott time to negotiate a consensual Chapter 11 restructuring which, if successful, would also inure to their benefit.  Upon the filing of the bankruptcy petition, Defendants authorized the payout of the final third of the retention bonuses to themselves, despite the fact that Tranche C under the SSSCA was never funded.

94.     In addition, the Management Incentive Plan in the Plan of Reorganization leaves management with a significant equity stake even as common stockholders' interests are eliminated.  It provides, "[e]ffective on the Effective Date, the Reorganized Debtors will reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock

appreciations rights or any combination thereof (each an 'Award' and such reserve, the 'MIP Pool') for grant to management employees and members of the New Board and enter into severance and change in control arrangements ('Severance Arrangements') with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ('Senior Executives') in amounts on terms and conditions to be agreed with and approved by the Required Consenting Lenders.  The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the 'Emergence Awards') with the terms of the Emergence Awards to be determined as set forth below and the remainder of the MIP Pool will be available for future grants to management employees and members of the New Board with allocations, terms and conditions to be determined by the New Board."[20]

95.     Further, Defendants Dickson and Krummel will receive substantial incentive payouts to remain at McDermott during the Bankruptcy Proceeding and throughout the pendency of the Lummus sale.  On February 10, 2020, McDermott filed an Emergency Motion for Entry of an Order (I) Authorizing and Approving (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting related Relief (Bankr. Proc. ECF No. 367) ("Emergency Motion").  The Emergency Motion sets forth incentive awards under a proposed Key Employee Incentive Plan ("KEIP")[21] for each participant, payable in cash at the conclusion of each performance period and upon the achievement of certain performance metrics.  For Defendant Dickson, the Emergency Motion identifies a Threshold Award Opportunity of $3,165,625, a Target Award Opportunity of $6,331,250, and a Maximum Award Opportunity of

---

[20] Amended Ch. 11 Plan (Bankr. Proc. ECF No. 121) at 42.

[21] There are 13 participants in the KEIP, including Defendants Dickson and Krummel. As acknowledged in the Emergency Motion, these participants "are generally responsible for the overall strategy and direction of McDermott's business enterprise as a whole and have played, and will continue to play, a central role in the Company's restructuring."  *Id*. at ¶ 10.

$12,662,500.  For Defendant Krummel, the amounts are $616,125, $1,232,250, and $2,464,500, respectively.[22]  On February 24, the Bankruptcy Court issued an Order (Bankr. Proc. ECF No. 473) granting the Emergency Motion.

96.     The Company's public filings with the SEC that attempt to conceal or otherwise obfuscate Defendants' fraudulent conduct are also highly probative of scienter.  For example, Defendants' repeated assertions that the sale process for Lummus is ongoing and the tying of certain key business plan milestones in the SSSCA to the sale process is highly probative of scienter; as are Defendants' dismissals of the prospect of a Chapter 11 filing as rumor or speculation.

97.     Even further, the fraud alleged herein implicates the core operations of McDermott, since its acute liquidity crisis threatened the Company's very existence as an ongoing concern.  In light of these facts and their day-to-day involvement in the development of a prepackaged Chapter 11 Plan of Reorganization, it is inconceivable that Defendants did not have actual access to information contradicting the statements made in the Company's name to regarding the sale process for Lummus and the prospect of bankruptcy. Such knowledge is imputable to Defendants given the implication of core operations and the Defendants' roles and status within the Company.

98.     Defendants' flagrant violation of express corporate policy further buttresses the inference of Defendants' scienter, whether based on their knowledge or their recklessness.

99.     McDermott's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code"), applies to the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Treasurer and Controller and other persons performing similar functions (the    "Covered    Employees").    The    Code    is    available    at

---

[22] *Id*. at ¶ 13.

http://s22.q4cdn.com/787409078/files/doc_downloads/governance_documents/CG-Code-of-Ethics-for-CEO-SFOs.pdf (last visited June 18, 2020).  Pursuant to the Code:

> **Full and fair disclosure.** It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. *Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes*. Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.
>
> It is the responsibility of each Covered Employee promptly to bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, *each Covered Employee shall promptly bring to the attention of the Disclosure Committee any information the employee may have concerning* (a) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) *any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls*.
>
> …
>
> **Reporting of violations of this code.** *Each Covered Employee is responsible for reporting any violation of this Code of Ethics, or circumstances which the Covered Employee considers to involve a probable violation, to the Compliance Officer identified below*. Employees may choose to remain anonymous in reporting violations or circumstances that may involve a violation.
>
> **Accountability.** *Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics*. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. *Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties*.

## VII.   NO SAFE HARBOR

100.   The statutory safe harbor provided for certain forward-looking statements do not apply to any of the false and/or misleading statements alleged herein.  None of the statements alleged herein is a "forward-looking statement."  Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

101.   In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by a director and/or executive officer of the Company who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

102.   None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## VIII.   LOSS CAUSATION

103.   The market for McDermott securities was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course

of conduct to deceive the market that artificially inflated the price of McDermott securities as a direct result of Defendants' false and misleading statements and/or omissions.  As set forth herein, at the end of the Class Period, when Defendants' prior false and misleading statements and/or omissions of fact became known to the public, the price of McDermott shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of McDermott securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the U.S. federal securities laws.

104.    During the Class Period, Defendants presented a misleading picture of McDermott's financial condition and business prospects.  Defendants' false and misleading statements had the intended effect and caused McDermott securities to trade at artificially inflated prices throughout the Class Period and until the truth was fully revealed to the market.

105.    Defendants knowingly and/or recklessly omitted to disclose the acute nature of McDermott's financial condition to investors, rendering their repeated statements about the Lummus sale process and repeated denials of a Chapter 11 filing false and misleading.

106.    Defendants' false and misleading statements and omissions artificially inflated the price of McDermott common stock, and operated as a fraud or deceit on acquirers of its securities.

107.    As detailed above, when the truth about McDermott's false and misleading statements and omissions was revealed by its Chapter 11 filing, the value of its shares drastically declined as the stock price was no longer artificially propped up.  The sharp decline in value of McDermott's securities was a direct and proximate result of the nature and extent of Defendants' fraudulent conduct.

108.    At all relevant times, Defendants' false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs and other class members.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

109.    At all relevant times hereto, and prior to its commencement of the Bankruptcy Proceedings, the market for McDermott common stock was an efficient market  for the following reasons, among others:

a.    McDermott common stock met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "MDR", a highly efficient and automated market;

b.    McDermott had approximately 181 million shares outstanding as of September 20, 2019, such that its stock was liquid, and numerous shares were traded on a daily basis, with moderate to heavy volume demonstrating an active and broad market for McDermott stock and permitting a strong presumption of an efficient market during the Class Period;

c.    As a regulated issuer, McDermott filed periodic public reports during the Class Period with the SEC and NYSE;

d.    McDermott regularly communicated with public investors via established market communication mechanisms including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    e.    The market reacted promptly to public information disseminated by McDermott;

    f.    McDermott was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period;

    g.    The material misstatements and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of McDermott securities; and

    h.    Without knowledge of the misstated or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased McDermott securities between the time Defendants misstated or failed to disclose material facts and the time the true facts were disclosed.

110.    As a result of the foregoing, the market for McDermott securities promptly digested current information regarding McDermott from all publicly available sources and reflected such information in McDermott stock price. Under these circumstances, all purchasers of McDermott securities during the Class Period suffered similar injury through their purchase of McDermott securities at artificially inflated prices and a presumption of reliance applies.

111.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding

whether to buy or sell the subject security.  Here, the facts withheld are material because an investor would have considered the Company's liquidity crisis and plan to restructure under Chapter 11 when deciding whether to purchase and/or sell McDermott securities.

## X.    CLASS ACTION ALLEGATIONS

112.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all individuals and entities that, during the Class Period, purchased or otherwise acquired McDermott common stock, or call options of or guaranteed by McDermott, either in the open market or pursuant or traceable to a registration statement, and were damaged thereby (the "Class").  Excluded from the Class are Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest.

113.    The members of the Class are so numerous that joinder of all members is impracticable since McDermott had 181 million shares of common stock outstanding as of September 20, 2019.  Throughout the Class Period, McDermott stock was traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may  be identified from records maintained by McDermott or its transfer agent and may be notified of the  pendency of this action by mail, using the form of notice similar to that customarily used in  securities class actions.

114.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal securities laws complained of herein.

115.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include, *inter alia*:

>   a.    whether Defendants violated the federal securities laws by the Defendants' respective acts as alleged herein;
>
>   b.    whether the Defendants acted knowingly and/or with deliberate recklessness in making false and misleading statements about the Company's liquidity and omitting to adequately disclose the likelihood of bankruptcy;
>
>   c.    whether the market prices of McDermott common stock and other publicly traded securities were artificially inflated during the Class Period because of the material misstatements and/or omissions complained of herein; and
>
>   d.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

116.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from the Defendants' wrongful conduct in a substantially identical manner.

117.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the other members of the Class.

118.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the  damages suffered by individual Class members may be relatively small, the expense and burden  of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 10(b) of Exchange Act and
Rule 10b-5 Promulgated Thereunder Against Defendants**

119.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

121.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase shares of McDermott common stock and call options of or guaranteed by McDermott at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

122.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of McDermott securities in an effort to maintain artificially high market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

123.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information, namely the risk of adverse regulatory action, about the business, operations and future prospects of McDermott as specified herein.

124.    Defendants engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of McDermott's value and performance and continued prospects, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about McDermott and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of McDermott securities during the Class Period.

125.    Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Defendants were high-level executives, directors, and/or agents at McDermott during the Class Period and members of the Company's management team or had control thereof; (2) each Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of McDermott, was privy to and participated in the creation, development and reporting of the Company's operations; (3) each Defendant enjoyed significant personal contact and familiarity with the other Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations at all relevant times; and (4) each Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

126.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the liquidity crisis and resulting bankruptcy faced by McDermott from the investing public and supporting the artificially inflated price of its securities. If Defendants did not have actual knowledge of the misstatements and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

127.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of McDermott common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of McDermott publicly-traded stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired McDermott securities during the Class Period at artificially high prices and were damaged thereby.

128.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truths regarding the Company's liquidity crisis and that Defendants would not permit the pre-petition sale of Lummus to bolster the Company's balance sheet – which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired

McDermott common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

129.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

130.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

131.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of common stock and call options giving rise to the cause of action.

<u>**COUNT II**</u>

**Violation of Section 20(a) of the Exchange Act Against Defendants**

132.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.    Defendants acted as controlling persons of McDermott within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by McDermott with the SEC and disseminated to the investing public, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of McDermott, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading and the decision not to disclose the true nature of the acute liquidity risks McDermott faced.  Defendants were either provided or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and

had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

134.   In particular, each of the Defendants had direct and supervisory involvement in the day-to-day operations of McDermott and, therefore, are presumed to have had the power to control or influence the particular statements and omissions giving rise to the securities violations as alleged herein, and exercised the same.

135.   As set forth above, Defendants violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

136.   By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of McDermott securities during the Class Period.

137.   This action was filed within two years of discovery of the fraud and within five years of each of Plaintiff's purchases of common stock and call options giving rise to the cause of action.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a.   Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as class representatives for the Class;

b.   Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class prejudgment and post-judgment interest, as well as their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorney's fees and expert fees; and

d.      Granting such other and further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: July 17, 2020

Respectfully submitted,

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**

*/s/ Malcolm T. Brown*
Malcolm T. Brown (*Pro Hac* Application filed)
Attorney-in-Charge
NY State Bar No. 2918498
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
brown@whafh.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

**Of Counsel:**

Thomas H. Burt (*Pro Hac* Application filed)
NY State Bar No. 2869550
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
burt@whafh.com

Marisa C. Livesay (*Pro Hac* Application filed)
CA State Bar No. 223247
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
livesay@whafh.com

Jean C. Frizzell
State Bar No. 07484650
Federal I.D. 14529
Michael K. Oldham
State Bar No. 00798405
Federal I.D. No. 21486
REYNOLDS FRIZZELL LLP
1100 Louisiana, Suite 3500
Houston, TX 77002
Telephone: (713) 485-7200
Facsimile: (713) 485-7250
jfrizzell@reynoldsfrizzell.com
oldham@reynoldsfrizzell.com